2020 IL App (1st) 171260-U

FIFTH DIVISION
December 31, 2020

No. 1-17-1260

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12 CR 19610 (02) |
| | ) | |
| TYRELL LEWIS, | ) | |
| | ) | Honorable Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Cunningham and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The circuit court erred by failing to inquire into the underlying factual basis of defendant's *pro se* claim of ineffective assistance of posttrial counsel. The circuit court also abused its discretion by not granting defendant a continuance to arrange for witnesses to testify in mitigation. Vacated and remanded with instructions.

¶ 2                                      BACKGROUND

¶ 3    After a joint but severed trial, defendant and codefendant Terry Bridges were each convicted of the first-degree murder of Kimberly Harris. Because the issues raised in this appeal relate entirely to posttrial proceedings, we restrict our recital of the underlying facts to those

necessary to for our present purposes. A more complete recital can be found in this court's ruling on Bridges's direct appeal. See *People v. Bridges*, 2019 IL App (1st) 163032-U.

¶ 4 At trial, two eyewitnesses identified defendant at the scene of the crime. The first, Andrew Allen, testified that he was near the scene and heard gunshots, but he denied or could not recall any other relevant details. The State then introduced prior inconsistent statements made by Allen to police, assistant state's attorneys, and a grand jury. In those statements, Allen claimed that he saw defendant shoot Harris multiple times.

¶ 5 The second eyewitness was Victor Tousignant, who lived near the crime scene. Tousignant testified that he went to his back porch after hearing several gunshots, and that he spotted defendant moving quickly out of the alley from which the noise seemed to have come. Tousignant later identified defendant in a police lineup and in open court.

¶ 6 The State also introduced evidence related to a separate shooting, to which Harris was the principal witness and Bridges's brother was the alleged perpetrator. This evidence was introduced to support the State's theory that defendant and Bridges had targeted Harris to prevent her from testifying against Bridges's brother. The evidence also included cellular phone data placing defendant's and Bridges's phones in the general area of the crime, forensic analysis of a recovered firearm, bullets, and shell casings from the scene of each shooting, evidence that Bridges had purchased the firearm, and evidence of communications between defendant, the Bridges brothers, and another alleged conspirator. Finally, the court heard evidence that Harris had been shot twice in the face and thirteen times in the torso and lower extremities.

¶ 7 Both defendant and Bridges rested without offering any evidence. Following closing arguments, the court found defendant guilty of first-degree murder, personal discharge of a firearm

resulting in death, and killing with the intent to prevent Harris from participating in a criminal prosecution.

¶ 8    Defendant's appointed trial counsel, Michael X. Wilson, presented a motion for a new trial on August 11, 2016. At that time, defendant informed the court that he wished to proceed *pro se* and file his own posttrial motion. The court admonished defendant about the nature of *pro se* representation and scheduled a future hearing date. At the next court date, Wilson informed the court that defendant persisted in his intention to proceed *pro se* and raise a claim for ineffective assistance of counsel. The court scheduled a hearing for August 31.

¶ 9    On that date, defendant presented and argued his motion for new trial. He contended that Wilson slept through substantial portions of the trial. Defendant claimed that Bridges and Bridges's trial counsel also noticed Wilson sleeping during the trial. He also argued that Wilson had not conferred with him before trial, had not interviewed any of the witnesses, and had not informed defendant about Tousignant. The court noted that the issue of counsel sleeping was not raised by anyone during trial, and that counsel had, in the court's opinion, adequately represented defendant. Consequently, the court denied defendant's *pro se* motion. Over the public defender's objection, the court reappointed the Public Defender's Office to represent defendant. The case was assigned to Assistant Public Defender David Dunn. Wilson resigned from the Public Defender's Office shortly thereafter.

¶ 10    Dunn later filed a motion to withdraw, arguing that the allegations that Wilson slept during the trial created a conflict of interest between the Public Defender's Office and defendant. The motion also claimed that the Public Defender's Office had conducted an internal investigation of the allegations and that three of Bridges's attorneys told supervisors that Wilson had slept through portions of the trial. Before the court ruled on that motion, John Paul Carroll, a private attorney,

3

moved for leave to file his appearance. The court granted each motion and set a future date for the presentment of a new posttrial motion.

¶ 11    Carroll filed a motion to reconsider the denial of defendant's *pro se* motion and, after several continuances, the court held an evidentiary hearing on the motion on January 27, 2017. First, defendant testified that Wilson repeatedly fell asleep during the trial, and that Brian Walsh, one of Bridges's attorneys, had tapped him and told him to wake up Wilson. Defendant claimed that he repeatedly had to wake Wilson during the trial. He also testified that he discussed Wilson's behavior with another of Bridges's attorneys, Crystal Carbellos, who advised him that he might upset the judge if he attempted to raise the issue. Defendant stated that he never attempted to bring Wilson's behavior to the court's attention during the trial because he "didn't want to upset the Judge" by disrupting the trial.

¶ 12    Carbellos testified that she observed Wilson with his eyes shut during the trial but had no opinion about whether he was asleep. She did not recall discussing the issue with defendant and denied ever advising him that he might upset the judge if he brought it to her attention.

¶ 13    Walsh testified that, at one point during the trial, he observed Wilson with "his head *** bent down a little bit, and his eyes appeared to be closed." He testified that Wilson was possibly asleep at that time, but that he was not sure. Walsh also testified that defendant had tapped him to notify him that Wilson was asleep, not the other way around.

¶ 14    Finally, Rosa Maria Silva, another of Bridges's attorneys, testified. She, too, observed Wilson with his eyes "closed various times during the trial," but she did not know whether he was asleep.

¶ 15    The court stated that it was "in the unique position of being a witness to the event," and observed that Wilson had made objections, asked questions, and made arguments, and at no point

appeared to be sleeping. The court denied the motion for reconsideration, ordered a new pre-sentence investigation (PSI) report, and set sentencing for February 28, 2017.

¶ 16     On that date, Carroll was present in court, but defendant was not. The case was continued until March 29. On that date, defense counsel waived defendant's appearance and, because the trial judge was not available that day, sentencing was continued until April 4.

¶ 17     On April 4, defendant appeared before the court for the first time since the hearing on the motion to reconsider in January. He stated that he wanted to proceed *pro se* and raise a new claim of ineffective assistance by Carroll and his associate Michelle Rodriguez. The court responded, "listen, we are going to continue to sentencing. You can file whatever motion at any time that you want. My question is, do you want them to represent you or do you want to represent yourself?" After an off-the-record exchange with his attorneys, defendant announced that he would proceed *pro se*.

¶ 18     At the sentencing hearing, defendant stated that he had no corrections to make to the PSI, which listed several prior convictions for, among other things, possession of controlled substances, public indecency, and robbery. The victim's sister published a victim impact statement. Then, two female officers from the Cook County Sheriff's Office testified about incidents during which defendant either masturbated in front of or exposed himself to them. Defendant did not cross-examine either officer. Two other corrections officers testified about altercations that defendant had with other inmates. Defendant cross-examined each officer on the frequency of altercations in jail, and each testified that they were not uncommon. The State rested its case in aggravation.

¶ 19     When asked if he had any evidence to present in mitigation the following exchange occurred:

"Defendant: Yeah, I have some witnesses, but I never got a chance to–these lawyers never talked to me about bringing them today.

The Court: Mr. Carroll, was there any–while not representing him as his attorney. Was there any discussion about witnesses?

Carroll: Judge, as a friend of the Court, I will tell you we informed him and his family that they could bring letters or have live testimony.

\* \* \*

The Court: Well, then they should have been here.

Defendant: How, when I didn't know we were going to get here[?]

The Court: We scheduled for sentencing, sir.

Defendant: How did I know that? I ain't talked to my lawyer since the motion.

The Court: Well, you fired them anyway so do you have anybody else that you want to present? Would you like your mother to testify in your behalf?

Defendant: No. So you basically not going to get my witness.

The Court: No, this was your opportunity to have them here.

Defendant: I ain't know I was going to get sentenced today.

The Court: We said this was for sentencing, sir.

> Defendant: How I know that? You wasn't here last week. How I know that?
>
> The Court: You would know it's for sentencing.
>
> Defendant: I ain't know nothing.
>
> The Court: State, argument."

¶ 20    The State requested a life sentence based on defendant's extensive criminal history, statutory aggravation factors, the brutal nature of the crime, and defendant's misconduct while in custody. Defendant did not make any argument in mitigation and made no statement in allocution. The court sentenced defendant to life imprisonment, noting the premeditated nature of the crime, defendant's motive in "executing" the key witness in another criminal case, and his extensive criminal history. This appeal followed.

¶ 21                                    ANALYSIS

¶ 22    Defendant raises two issues on appeal. First, he contends that the court failed to adequately investigate his *pro se* allegation that Carroll and Rodriguez rendered ineffective assistance. Second, he argues that the court abused its discretion in sentencing him to life imprisonment without granting a continuance so that he could present witnesses in mitigation.

¶ 23    When a defendant brings a *pro se* posttrial claim of ineffective assistance of counsel, the court must conduct an inquiry into the claim and under certain circumstances, appoint new counsel to argue the claim. *People v. Krankel*, 102 Ill. 2d 181, 1870-189 (1984). The court, however, is not required to automatically appoint new counsel merely because a defendant makes such a claim; instead, the court must first examine the factual basis underlying the defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). The court can base its evaluation on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face. *Id.* at 79. "[W]hen a defendant brings a clear claim asserting ineffective assistance of counsel, either

7

orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *People v. Ayres*, 2017 IL 120071, ¶ 18. The *Ayres* court explained that a proper *Krankel* hearing is a prerequisite to appellate review of trial error, stating:

> "Moreover, '[b]y initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create the necessary record for any claims raised on appeal.' Absent such a record, as in the case at bar, appellate review is precluded. Moreover, the inquiry is not burdensome upon the circuit court, and the facts and circumstances surrounding the claim will be much clearer in the minds of all involved when the inquiry is made just subsequent to trial or plea, as opposed to years later on appeal." (Alteration in the original.) *Id*. ¶ 21 (quoting *People v. Jolly*, 2014 IL 117142, ¶ 38).

A trial court's duty to inquire under *Krankel* is the same whether the defendant raises one allegation of ineffective assistance or successive allegations. *People v. Horman*, 2018 IL App (3d) 160423, ¶ 27 ("a defendant could raise multiple ineffective assistance of counsel claims posttrial that require successive *Krankel* proceedings").

¶ 24    Defendant argues that the court failed to conduct any inquiry at all into his claim of ineffective assistance by Carroll and Rodriguez. He points out that on April 4, he represented to the court several times that he wished to raise a claim of ineffective assistance at the January 27 hearing. This triggered the court's obligation under *Ayers*. Rather than conduct any inquiry into defendant's claim, the court simply proceeded with sentencing and thwarted every attempt defendant made to argue the effectiveness of counsel.

¶ 25 The State responds that *Krankel* and its progeny are inapplicable because Carroll and Rodriguez were private attorneys. Alternatively, the State argues that any error in not conducting a *Krankel* inquiry was harmless.

¶ 26 The State relies on *People v. Pecoraro*, 144 Ill. 2d 1, 15 (1991) for the proposition that *Krankel* is inapplicable in situations where the attorney who allegedly rendered ineffective assistance was privately retained. Both parties acknowledge that there is a split between the appellate districts of this court on this issue. Compare *People v. Shaw*, 351 Ill. App. 3d 1087, 1092 (2004) (no *Krankel* inquiry required because the defendant was represented by private counsel) with *People v. Johnson*, 227 Ill. App. 3d 800, 810 (1992) ("we do not believe *Pecoraro* stands for the proposition that a trial court is free to automatically deny a *pro se* request for new counsel simply because the defense counsel who was allegedly ineffective was privately retained.").

¶ 27 In a special concurrence, Justice Anne Burke of our supreme court outlined the split of authority and compellingly argued that *Krankel* is applicable whether the attorney was retained or appointed. *People v. Taylor*, 237 Ill. 2d 68, 78-81 (2010) (Burke, J. specially concurring)). Because the purpose of a *Krankel* inquiry is to "create the necessary record for any claims raised on appeal" (*Jolly*, 2014 IL 117142, ¶ 38), and the constitutional right to effective assistance of counsel exists without distinction between the assistance of private or appointed counsel (*Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980)), we agree with Justice Burke that "[t]o read *Pecoraro* as prohibiting a *Krankel* inquiry simply because counsel was retained would conflict with Supreme Court authority and would be a violation of the sixth amendment right to effective assistance of counsel." *Taylor*, 237 Ill. 2d at 81 (Burke, J. specially concurring). Consequently, we find that the circuit court erred in failing to inquire into the underlying factual basis of defendant's *pro se* claim of ineffective assistance of counsel by Carroll and Rodriguez.

¶ 28    Even so, the State contends that the error was harmless because the record establishes that Carroll and Rodriguez competently, if unsuccessfully, represented defendant at the January 27 hearing. But the State's eagerness to address the merits of defendant's ineffective assistance claim is misguided. As noted above, the purpose of the preliminary *Krankel* inquiry is to "create the necessary record for any claims raised on appeal." *Jolly*, 2014 IL 117142, ¶ 38. Where no record was made of the exact nature of the claims "it is simply not possible to conclude that the trial court's failure to conduct an inquiry into those allegations was harmless beyond a reasonable doubt." *Moore*, 207 Ill. 2d at 81. The record reveals nothing further than that defendant alleged that he received ineffective assistance at the January 27 hearing. Because the circuit court made no inquiry into defendant's claim, this court is incapable of evaluating the merits of the claim. We therefore remand this cause with instructions to conduct a preliminary *Krankel* inquiry into defendant's *pro se* claim of ineffective assistance by Carroll and Rodriguez.[1]

¶ 29    Defendant's second contention is that the court erred in denying him a continuance before sentencing so that he could arrange for mitigation witnesses. Strictly speaking, our disposition on the *Krankel* issue creates the possibility that the sentencing issue will become moot. However, if after a *Krankel* inquiry, the circuit court finds that defendant's claim of ineffective assistance by Carroll and Rodriguez is without merit, the sentencing question will need to be addressed. Therefore, in the interest of judicial economy, we choose to address the sentencing issue. See, *e.g.*,

---

[1] The parties dispute the significance of the fact that Carroll and Rodriguez were investigated and sanctioned by the Attorney Registration and Disciplinary Commission for conduct not related to this case. However, such proceedings have no bearing on the effectiveness of assistance in this case, and they do not factor into our analysis. See *People v. Williams*, 298 Ill App. 3d 58, 65 (1998) (effectiveness of assistance is determined on a case-by-case basis, regardless of whether "defense attorney has disciplinary proceedings pending during his representation of a defendant").

*Catania v. Local 4250/5050 of Communications Workers of America*, 359 Ill. App. 3d 718, 725 (2005) (addressing potentially moot "issues that are likely to arise again on remand.").

¶ 30    The State vigorously argues that defendant's arguments on this issue have all been procedurally defaulted. In particular, the State points to the fact that defendant did not raise this issue in a post-sentencing motion, thus forfeiting the issue absent plain error. See *People v. Enoch*, 122 Ill. 2d 176, 186-187 (1988). Additionally, the State argues that even plain-error review is unavailable because defendant did not make a plain-error argument in his opening brief. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (arguments not raised in an opening brief "are forfeited and shall not be raised in the reply brief").

¶ 31    Notwithstanding defendant's failure to raise the issue in a post-sentencing motion, we may review the circuit court's decision for plain error. See *Enoch*, 122 Ill. 2d at 186-187. That defendant did not specifically argue plain error in his opening brief likewise does not preclude our review. See *People v. Williams*, 193 Ill. 2d 306, 348 (2000) ("it would be unfair to require a defendant to assert plain error in his or her opening brief"). Therefore, we review the circuit court's decision to deny defendant a continuance for plain error.

¶ 32    The plain-error doctrine is codified in Illinois Supreme Court Rule 615(a), which states, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a). Plain errors may be noticed when a "clear or obvious error occurred" and "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or if the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). A defendant raising a plain-error argument bears the

11

burden of persuasion. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The first step in plain-error analysis is to determine whether there was error at all. *People v. Walker*, 232 Ill. 2d 113, 124 (2009).

¶ 33    The decision to grant or deny a continuance "is a matter resting in the sound discretion of the trial court, and a reviewing court will not interfere with that decision absent a clear abuse of discretion." *Id.* at 125. "However, '[w]here it appears that the refusal of additional time in some manner embarrassed the accused in the preparation of his defense and thereby prejudiced his rights, a resulting conviction will be reversed.' " *Id.* (quoting *People v. Lewis*, 165 Ill.2d 305, 327 (1995)). In deciding whether to grant a continuance, courts may consider several factors, such as the movant's diligence, the interests of justice, the history of the case, the seriousness of the charges, and the convenience of the parties and witnesses. *Id.* at 125-26. Denying a motion for a continuance without considering any such factors is an abuse of discretion. *Id.* at 126.

¶ 34    The State argues, relying on *People v. Hicks*, 125 Ill. App. 2d 48 (1970) that to be entitled to reversal, defendant would have to have made an offer of proof to create a record of why he needed a continuance. See *Id.* at 57-58 ("It is vital that attorneys for defendants make a statement as to what if anything would be presented in mitigation so as to give the trial court the opportunity of determining whether or not a continuance should be granted."). However, defendant did tell the court that he had "some witnesses" whom he intended to call in mitigation. Rather than inquire who these witnesses were or what they were expected to testify to, the court simply stated, "Well, then they should have been here." To the extent that defendant was obliged to make an offer of proof, the court's mechanical rejection of his assertions prevented him from doing so: "No, this was your opportunity to have them here."

12

¶ 35    Rather than the fifty-year-old *Hicks* case from this court, we look to the far more recent *Walker* case from our supreme court. In that case, on the day of trial, defense counsel candidly stated that she was not prepared for trial. *Walker*, 232 Ill. 2d at 127. "The circuit court tersely responded, "[i]t is irrelevant," and cut off any further explanation that could be offered by counsel *** ." *Id*. Our supreme court held that the trial court erred when it "mechanically denied the continuance without engaging in thoughtful consideration of the specific facts and circumstances presented in this matter." *Id.* at 126. As in that case, the court here cut off defendant's ability to argue by simply asserting that he and his witnesses should have known that the case was set for sentencing.

¶ 36    Defendant argues that his statement to the circuit court that he was unaware that the case was set for sentencing stands unrebutted. As does his assertion that he had mitigation witnesses prepared, but who were not in court because they had not been informed of the April 4 hearing. Moreover, his assertions are supported by the record and consistent with his allegation that he had no contact with posttrial counsel between the January hearing and April 4. However, defendant contends, the record shows no indication that the circuit court ever considered the obvious prejudice that would result from forcing him to proceed to sentencing without the benefit of his mitigation evidence.

¶ 37    The State argues that the record reveals a pattern of behavior by defendant that was calculated to obstruct and delay the proceedings. Moreover, the State contends that the circuit court's decision not to grant a continuance could have been based on concerns about judicial economy, docket management, and convenience of the parties, thus satisfying *Walker*. However, the record does not show that the circuit court actually considered these factors, or any of the others listed in *Walker*. See *Id.* ("the record *** it is devoid of evidence showing that the circuit court

13

considered any of the relevant factors in denying the continuance."). In this case, as in *Walker*, the circuit court completely failed to exercise discretion.

¶ 38    Having determined that there was an error, we also find that the error was so serious as to affect the fairness of defendant's sentencing hearing and challenged the integrity of the judicial process. See *Piatkowski*, 225 Ill. 2d at 565. The result of the circuit court's error was to force defendant, unprepared and without his mitigation witnesses, into a sentencing hearing where the maximum penalty—which he ultimately received—was to spend the rest of his natural life in prison. A defendant found guilty at trial has the right to a sentencing hearing and is entitled to a reasonable amount of time to prepare to present mitigating evidence at that hearing. *People v. LaRocco*, 123 Ill. App. 2d 123, 128 (1970). In *LaRocco*, the defendant had been convicted of misdemeanor public indecency and sentenced to 65 days' imprisonment. *Id.* at 125. How much more important is the appearance of a fair sentencing hearing when the sentence is life imprisonment? Defendant, therefore, has satisfied the second prong of the plain-error doctrine.

¶ 39    Nevertheless, the State argues that the error was harmless because life imprisonment is the only reasonable sentence in this case. Given defendant's prior criminal record, the brutal and premeditated nature of the crime, and defendant's subsequent infractions while in custody, the State argues that no evidence offered by defendant could have made any difference in what sentence the judge imposed. However, because the circuit court had both broad discretion in fashioning a sentence (*People v. Patterson*, 217 Ill. 2d 407, 448 (2005)) and a duty to consider mitigating evidence (*People v. Markiewicz*, 246 Ill. App. 3d 31, 55-56 (1993)), it is impossible for this court to determine that life imprisonment was the *only* possible sentence, especially since the court never heard defendant's evidence in mitigation.

¶ 40                            CONCLUSION

¶ 41    The circuit court erred in failing to inquire into the underlying factual basis of defendant's *pro se* claim of ineffective assistance by Carroll and Rodriguez. The circuit court also abused its discretion by not granting defendant a continuance to arrange for witnesses to testify in mitigation. We vacate the defendant's sentence and remand the case for an initial *Krankel* inquiry and, if necessary, a new sentencing hearing.

¶ 42    Vacated and remanded with instructions.